**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**NEIL GIFFORD LONG,**

      **Plaintiff,**

**v.**                           **CIVIL ACTION NO. 1:14-CV-31**
                                            **(JUDGE KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**


## REPORT AND RECOMMENDATION

## I. INTRODUCTION

On February 24, 2014, Plaintiff Neil Gifford Long ("Plaintiff"), proceeding *pro se*, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1). On April 29, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 11; Administrative Record, ECF No. 12). The answer and administrative record were mailed to Plaintiff's incorrect address and the Court ordered Defendant to re-mail the documents to Plaintiff's updated address on July 31, 2014. (ECF No. 22). On September 30, 2014, and October 16, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 24; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 25). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. <u>PROCEDURAL HISTORY</u>

On August 17, 2010, Plaintiff protectively filed his application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on December 18, 1995 due to degenerative disc disease, hepatitis C, arthritis, headaches, chronic dislocation of his left knee and heart problems. (R. 134, 173). This claim was initially denied on November 18, 2010 (R. 74) and was denied again upon reconsideration on February 11, 2011 (R. 82). On May 3, 2011, Plaintiff filed a written request for a hearing (R. 85), which was held before United States Administrative Law Judge ("ALJ") George A. Mills, III on March 19, 2012 in Morgantown, West Virginia. (R. 35). Plaintiff, proceeding *pro se*, appeared by phone and testified, as did James E. Ganoe, an impartial vocational expert. (R. 35). On May 7, 2012, the ALJ issued a partially favorable decision to Plaintiff, finding that Plaintiff became disabled on July 6, 2011, the date of his fifty-fifth birthday when his age category changed, and that Plaintiff has continued to be disabled through the date of the ALJ decision. (R. 30). On June 27, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 13).

## III. <u>BACKGROUND</u>

**A. Personal History**

Plaintiff was born on July 6, 1956, and was fifty-four (54) years old at the time he filed his SSI claim. (R. 134). Plaintiff completed high school plus one year of college. (R. 46). Plaintiff served in the Navy from 1973 to 1974 and received an honorable discharge. (R. 47). He previously worked in the gas and oil fields but stopped working in 1991 when he became disabled. (<u>Id.</u>).

Plaintiff is single and has no children. (R. 46, 134).

In 1991, Plaintiff suffered a spinal injury at work. (Complaint at 2, ECF No. 1). Plaintiff initially received workers' compensation benefits and then applied for SSI benefits in 1995. (R. 40). On February 4, 1999 Administrative Law Judge Harry Taylor, II issued a fully favorable decision finding that "[t]he evidence supports a finding that Mr. Long has degenerative disc disease and chronic pain syndrome, impairments which cause significant vocationally relevant limitations." (1999 ALJ Decision at 2, ECF No. 18-2).[1] The ALJ further found that "[t]he documentary medical reports support a finding that the claimant has impairments which meet the criteria described in 1.05C." (Id.). The ALJ further concluded that the "symptoms associated with claimant's listed impairments have persisted since December 18, 1995." (Id.). Plaintiff received SSI benefits from 1995 to 2006. (R. 40; Complaint at 2, ECF No. 1). In 2006, Plaintiff was incarcerated and his benefits were suspended. (R. 40); see 42 U.S.C. § 1382(e)(1)(A) ("[N]o person shall be an eligible individual or eligible spouse for purposes of this subchapter with respect to any month if throughout such month he is an inmate of a public institution."). Plaintiff's benefits were suspended for a period of longer than twelve (12) months, therefore his benefits were terminated. see 20 C.F.R. § 416.1335 (stating that SSA "will terminate your eligibility for benefits following 12 consecutive months of benefit suspension for any reason beginning with the first month you were no longer eligible."). Accordingly, Plaintiff filed a new application for SSI on August 17, 2010 following his release from jail. (R. 134);

Plaintiff testified at the administrative hearing that he violated his parole and was re-

---

[1] ALJ Taylor's 1999 decision was not included in the administrative record but was included as an exhibit to Plaintiff's Motion to Appoint Counsel, filed on June 16, 2014. (ECF No. 18-2).

incarcerated on July 28, 2011. (R. 39). However, medical records from Tygart Valley Regional Jail indicate Plaintiff was incarcerated as early as February 10, 2011[2] (R. 250) and then released on April 26, 2011. (R. 270). These medical records also indicate that Plaintiff was in fact re-incarcerated on July 28, 2011. (R. 259). At the time of his administrative hearing, Plaintiff anticipated his release from incarceration in July 2012. (R. 39). When Plaintiff filed his Complaint with the Court on December 5, 2013, Plaintiff was incarcerated at St. Mary's Correctional Center. (Complaint Envelope, ECF No. 1-2). On February 24, 2014, Plaintiff notified the Court of a change of address as of March 21, 2014 to a residential address in Selbyville, West Virginia, which indicates Plaintiff may no longer be incarcerated and thus eligible to receive SSI benefits. (Notice of Change of Address, ECF No. 4).

## B.    Benefits Period at Issue

At issue in this case is a relatively short period of time for which Plaintiff seeks SSI benefits. Plaintiff applied for SSI on August 17, 2010. (R. 134). According to SSA regulations, "[w]hen you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application." 20 C.F.R. § 416.335. This means, should Plaintiff be found disabled and eligible for SSI, the earliest month for which he can be paid benefits is September 2010.

Based on the medical records provided, Plaintiff was incarcerated from February 10, 2011 to April 26, 2011. (R. 252,270). Because Plaintiff was incarcerated for less than twelve (12)

---

[2] The medical records include a Screening Form from February 14, 2011 (R. 250) and physical examination notes such as height, weight, temperature, pulse and interview questions from February 10, 2011 (R. 252-59). The records also indicate that Plaintiff received medication through March 31, 2011 (R. 268) and then was released on April 26, 2011 (R. 270).

months, his benefits would merely be suspended during this time. Thus, Plaintiff would be eligible to receive benefits from September 1, 2010 through February 9, 2011, approximately five (5) months. Following his April 26, 2011 release, Plaintiff's benefits would be reinstated on May 1, 2011. However, Plaintiff was subsequently re-incarcerated on July 28, 2011, at which time his benefits would again be suspended. Moreover, the ALJ found Plaintiff to be disabled beginning on his fifty-fifth birthday, July 6, 2011, which means Plaintiff would be eligible to receive benefits from May 1, 2011 to July 6, 2011, approximately two (2) additional months. Thus, at issue is approximately a total of seven (7) months of SSI benefits.

## C.    Medical Evidence

### 1.  Medical Records

On August 31, 2010, Plaintiff appeared for a new patient visit at the Tri-County Health Clinic, Inc. (R. 423-26). Plaintiff was recently released from prison and presented for a disability exam, to establish a primary care physician and for treatment of his chronic pain. (R. 423). Plaintiff medical history included: 1) chronic pain, a discectomy at C4-5, pain at the base of neck, decrease range of motion (rotation), pain with range of motion into both shoulders and no radiculopathy in arms; 2) lumbar pain since motor vehicle accident years ago, specifically pain in the paraspinal muscles that radiates into left leg and foot, numbness along lateral leg and lateral half of foot; 3) coronary artery disease and myocardial infarction ("CAD MI"), that is a heart attack, twice, with no catheter or coronary artery bypass graft; and 4) hepatitis C. (Id.). Patient's active medications included hydrocodone, nitroglycerin and temazepam. (R. 424). The review of symptoms included chronic pain as previously described. (Id.). The physical examination noted:

> pain on palp of c spine at c4-7 level no paraspinal tenderness or spasm + crepitance pain with rom all dir slightly decreased rom with flection and rotation. 1 spine pain on palp of spinus process and paraspinal musle and si joint on left. No spasm neg slr dtr 2+ strength 5/5 gait wnl hips pain with rom in hip joint all dir and with rotation left > right.

(Id.). Plaintiff's diagnoses were 1) cardiovascular disease; 2) unspecified viral hepatitis C without hepatic coma; 3) mixed hyperlipidemia; 4) lumbago with radiculopathy left leg; 5) carpal tunnel syndrome; 6) cervicalgia discectomy C4-5; and 7) melanoma of skin on chest, removed. (R. 425). Plaintiff was given a refill of nitroglycerin for chest pain, temazepam and hydrocodone. (R. 425-26). Plaintiff was told to follow-up in one month and to schedule x-rays. (R. 426).

On August 31, 2010, Dr. Baker with the Tri-County Health Clinic, completed a form regarding Plaintiff's physical examination. (R. 427-38). The examination showed abnormalities with Plaintiff's neck, including decrease range of motion due to pain and tenderness on palpitation of spine. (R. 428). The physician also noted tenderness at Plaintiff's abdomen. (Id.). Neurologically, Plaintiff has radiculopathy of the left leg. (Id.). As for orthopedic abnormalities, Plaintiff has decreased lumbar range of motion on palpitation of spine, joint pain with range of motion and a negative straight leg raise. (Id.). The physician described the pain as pain at the C4-6 level with decreased range of motion in all directions and lumbar pain that radiates into left leg to foot. (Id.). The diagnoses were chronic neck/lumbar pain, arteriosclerotic cardiovascular disease ("ASCVD"), hepatitis C and history of melanoma. (Id.).

On September 29, 2010, an x-ray of Plaintiff's lumbar spine was completed by request of the West Virginia Social Security Department for a disability evaluation. (R. 222). The X-rays showed "normally preserved alignment throughout the lumbar spine. Normal vertebral body

heights and disc space intervals are preserved. There is no spondylosis or spondylolisthesis." (Id.).
The overall impression was "normal lumbar spine films." (Id.).

On October 4, 2010, Plaintiff had a follow-up appointment at the Tri-County Health Clinic.
(R. 430-32). Plaintiff presented with chronic back pain and rated his pain at an eight out of ten. (R.
431). The physician noted that Plaintiff "needs comprehensive management" for his pain but noted
that the clinic is not taking any new patients at the time. (R. 430). The physical examination showed
Plaintiff in no apparent distress and otherwise normal findings. (R. 432). Plaintiff's treatment plan
included scheduling an appointment with a gastroenterologist for treatment of hepatitis C. (R. 430).

On October 12, 2010, Plaintiff had a follow-up appointment at Tri-County Health Clinic
to review his labs and refill medications. (R. 433-35). Plaintiff reported pain in his back, neck,
hands and feet. (R. 433). Plaintiff denied any abdominal pain at this time and his only complaints
were related to his chronic neck and back pain. (Id.). The physical examination and review of
symptoms were normal. (R. 434). The assessment at this time was hepatitis C, lumbago with
radiculopathy left leg and cervicalgia discectomy C4-5 and his active problems also included
cardiovascular disease, mixed hyperlipidemia and carpal tunnel syndrome. (R. 433). The physician
noted that Plaintiff should find a doctor that can care for his chronic pain. (R. 435).

On December 14, 2010, Plaintiff appeared for a consultation with Dr. Nitesh Ratnakar,
M.D., a gastroenterologist at West Virginia Gastroenterology and Endoscopy, regarding his
hepatitis C diagnosis. (R. 420-22). Plaintiff reported that he was diagnosed with hepatitis C roughly
four (4) years prior. (R. 420). He has a high viral load and is genotype 1A. (Id.). Plaintiff's past
medical history included heart attack, arthritis and liver disease. (R. 421). When reviewing

Plaintiff's symptoms, he denied any problems, including headaches and joint pain. (Id.). Plaintiff's physical exam was overall normal. (R. 422). The diagnoses at this time included hepatitis C genotype 1A with high viral load and colorectal neoplasia screening. (Id.). Counseling regarding hepatitis C and treatment options was provided at this time as well. (Id.). Plaintiff was scheduled for a liver biopsy, upper endoscopy and colonoscopy. (Id.).

On January 6, 2011, Plaintiff underwent a liver biopsy as ordered by Dr. Ratnakar. (R. 418). The microscopic diagnosis included chronic hepatitis, grade 2, stage 2, mild interface hepatitis, confluent necrosis is absent, focal mild lytic necrosis and lobular inflammation and mild portal inflammation. (R. 419). The pathologist further noted cirrhosis was not seen and included histological differential diagnoses. (Id.).

On January 25, 2011, Plaintiff underwent an esophagogastroduodenoscopy (EGD) and colonoscopy by Dr. Ratnakar. (R. 412, 440). Before the procedure, Plaintiff's diagnosis included chronic liver disease, chronic hepatitis C, esophageal variceal screening and colorectal neoplasia screening. (R. 412). Following the procedures, the EGD showed normal findings and the colonoscopy showed a polyp in the hepatic flexure measuring 6 mm, polyp in the sigmoid colon measuring 8 mm, diverticulosis and internal hemorrhoids. (Id.). The colon polyps were removed during the procedure and biopsy ordered. (Id.). The tissue report from the colon, hepatic flexure, polypectomy sample indicated tublar adenoma and was negative for high grade dysplasia. (R. 414). The rectum, polypectomy sample indicated a hyperplastic polyp. (Id.).

The record contains initial intake treatment notes from Tygart Valley Regional Jail/Prime Care Medical for his February 10, 2011 incarceration (R. 250, 252-59) and then again for his July

28, 2011 incarceration (R. 251, 259-60). These notes include Plaintiff's operation history, which lists a discectomy, right leg, tonsillectomy, heart catheterization and a liver biopsy. (R. 250). Plaintiff's medical history includes depression, headaches and hepatitis C. (Id.). He also reported back pain and degenerative disk disease. (R. 255). In July 2011, Plaintiff's medications included hydrocodone (R. 254), Inderal for high blood pressure, ProAir and Spiriva inhalers, Dexilant for heartburn or gastroesophageal reflux disease, Loratab for pain, Trazodone for depression, Baclofen as a muscle relaxer, and Lyrica for nerve and muscle pain (R. 251). In regard to his mental health, Plaintiff reported depression and a prior suicidal attempt six years prior in 2005 and noted that he would like to see a psychiatrist or psychologist. (R. 254).

Upon his incarceration on February 10, 2011, Plaintiff reported a history of back pain, headaches, enlarged prostate and depression. (R. 385). Plaintiff mainly attended mental health-related appointments during his incarceration from February 10, 2011 to April 26, 2011. From February 10 to February 17, 2011, Plaintiff was placed on a fifteen (15) minute suicide watch due to statements he made to his parole officer; however, Plaintiff denied suicidal ideation. (R. 336-43, 385). On February 24, 2011, Plaintiff had an appointment with a psychiatrist. (R. 343). On March 1, 2011, a sick call was completed and the physician notes indicated a review of Plaintiff's medical history, which include musculoskeletal problems and headaches. (Id.). On March 9, 2011, Plaintiff had an appointment with a mental health counselor for anxiety/panic attacks. (R. 344). Plaintiff was released on April 26, 2011.

On April 28, 2011, Plaintiff had an appointment with Dr. Nitesh Ratnakar, M.D., a gastroenterologist. (R. 408). Plaintiff reported he was stable and the physical examination revealed

normal findings. (Id.). Plaintiff's diagnoses included hepatitis C with a high viral load ("HVL") Genotype 1A, a liver biopsy grade 2, and diverticulitis. (Id.). Dr. Ratnaker ordered additional laboratory tests and discussed with Plaintiff the colonoscopy, polyp, esophagogastroduodenoscopy ("EGD") and liver biopsy. (Id.).

On May 13, 2011, a CT scan of Plaintiff's abdomen was completed. (R. 407). The CT scan was normal and no acute process demonstrated. (Id.).

On June 22, 2011, Plaintiff had an appointment with Dr. Nitesh Ratnakar, M.D., a gastroenterologist. (R. 406). Plaintiff's physical examination was overall normal with the exception of his abdomen. (Id.). Plaintiff's diagnoses included hepatitis C and colon polyps and a colonoscopy was discussed. (Id.).

Upon Plaintiff's re-incarceration on July 28, 2011, Plaintiff was initially monitored for opiate detoxification until August 8, 2011. (R. 345-56). At intake, Plaintiff denied any mental health issues or homicidal/suicidal ideation. (R. 386). Plaintiff reported he had a colonoscopy which showed pre-cancerous cells and he was to be given a chemotherapy 48 week regiment. (Id.). Plaintiff was housed in medical at the time and was utilizing a wheelchair. (Id.). On August 23, 2011, Plaintiff was seen at the clinic to review his chronic care, which included high blood pressure, heart condition, hepatitis C, pulmonary issues and renewing his medications. (R. 356).

Plaintiff continued to receive mental health treatment during his incarceration. Plaintiff had appointments on August 11, 2011 (R. 356), September 27, 2011 (R. 358), October 6, 2011 (R. 258), October 25, 2011 (R. 359), November 3, 2011 (R. 360), November 14, 2011 (R. 261), November 29, 2011 (R. 361), December 8, 2011 (R. 362) and March 1, 2012 (R. 376). Plaintiff

reported depression and feelings of being overwhelmed (R. 359) as well as problems with anxiety (R. 386). On August 10, 2011, Plaintiff appeared very tearful and stated "I'm so overwhelmed." (R. 386). On October 23, 2011, Plaintiff reported feeling very depressed and asked to speak with a doctor regarding his medication. (R. 386). From November 28, 2011 to December 8, 2011, Plaintiff was placed on suicide watch. (R. 361, 386).

The record also contains treatment notes related to Plaintiff's physical conditions from July 28, 2011 (R. 345) through July 25, 2012 (R. 385).

On October 25, 2011, Plaintiff's sick call was completed in which he reported leg pain and depression. (R. 359).

On November 22, 2011(R. 361), January 17, 2012 (R. 364) and April 10, 2012, Plaintiff had appointments with a nurse practitioner regarding his cardiac and pulmonary issues. On December 28, 2011, blood pressure checks every week for three months were ordered (R. 362), which were continued through July 25, 2012 (R. 385).

On January 18, 2012, the nurse reported that Plaintiff was hemoccult positive and noted "we really need to get a referral for gi doctor and repeat colonoscopy has a hx of colon cancer supposedly but he does have a grossly positive occult blood. We need to review old records if any here for pain management." (R. 364). On January 19, 2012, an x-ray of Plaintiff's abdomen and spine was requested after Plaintiff fell back and hurt his neck. (R. 366). On February 1, 2012, Plaintiff received his annual physical but the treatment note does not discuss the examination or results. (R. 370).

Also on February 1, 2012, Plaintiff had an appointment with Dr. Ratnaker, a

gastroenterologist and an outside provider, for a GI consult and colonoscopy. (R. 369, 387). Plaintiff presented to the appointment and reported overall doing okay but experiencing generalized abdominal pain. (R. 405). Dr. Ratnaker diagnosed Plaintiff with a history of colon polyps, diverticulosis, hepatitis C genotype 1A high viral load ("HVL") Grade 2 and heme positive stool. (Id.). Dr. Ratnaker ordered a complete blood count with differential, a prothrombin time (PT) and international normalized ratio test, which are used to determine clotting tendency of blood, a hepatic function panel and thyroid-stimulating hormone (TSH) test. (R. 373, 405). On February 16, 2012, Plaintiff was prepped for a colonoscopy, which was scheduled for the following day. (R. 375, 387).

The record also contains Plaintiff's Medication Administration Record at Tygart Valley Regional Jail from February 10, 2011 to April 26, 2011 (R. 290-96) and then July 28, 2011 through February 9, 2012. (R. 296-335). Plaintiff's regular medication regimen included ibuprofen and Motrin as well as an anti-depressant/anti-anxiety medication, which included Celexa, Effexor, Amitriptyline, Trazodone, Elavil, Visatril, Paxil and Buspar. (Id.). In July 2011, Plaintiff began receiving an albuterol inhaler, Phenergan for nausea, Propranolol, which treats high blood pressure, Bentyl, which treats irritable bowel syndrome, and Prilosec for heartburn. (R. 296-99). In October 2011, in addition to the aforementioned medications, Plaintiff also began receiving Naprosyn, which is an anti-inflammatory medication that is used to treat pain. (R. 311). In January 2012, Plaintiff began receiving Ultram, a medication used to treat moderate to severe pain. (R. 330).

### 2. Medical Opinions and Reports

### a.  Consultative Examination by Dr. Arturo Sabio, M.D., October 11, 2010

On September 29, 2010, Dr. Arturo Sabio conducted a history and physical examination of Plaintiff on behalf of the West Virginia Disability Determination Service and prepared the consultative examiner report on October 11, 2010. (R. 223-227). Plaintiff's chief complaints were degenerative disk disease, hepatitis C, arthritis, chronic dislocation of left knee and heart problems. (R. 223).

Plaintiff's medical history included hypertension and a heart attack in 2006 and 2004 but Plaintiff has declined to have a cardiac catheterization or stints inserted. (R. 223). Plaintiff takes nitroglycerin to relieve his chest pain. (Id.). Plaintiff was diagnosed with hepatitis C in 2004 but has not received treatment. (Id.). Plaintiff reported chronic dislocation in his left knee, which results in swelling on ambulation and pain. (Id.). Plaintiff reported neck pain since 1991 as well as a discectomy at the cervical spine in 1991. (Id.). Plaintiff explained that his condition initially improved but following a car accident in 2005, he injured his neck and lumbar spine. (Id.). Plaintiff reported pain in his lumbar spine, radiating to the right leg down to the right knee, as well as numbness of the left leg down to the left foot. (Id.). Plaintiff noted increased pain after heavy lifting, one hour of sitting or two hours of riding in a car and ambulation of one hour. (R. 224). Plaintiff further reported that his fingers become tender and knees become stiff and pain in his left foot. (Id.). His past medical history also included a right leg open reduction and internal fixation with screws. (Id.). Plaintiff did not have an MRI or x-rays and did not seek consultation for his problems. (Id.). Plaintiff's medications at this time included hydrocodone, nitroglycerin tablets and Restoril, a benzodiazepine. (Id.).

The physical examination noted that Plaintiff walks with an antalgic gait supported by a cane in his right hand and is stable at station. (R. 224). An examination of Plaintiff's neck showed no stiffness, thyromegaly, or masses. (R. 225). Plaintiff's heart rate and rhythm were normal. (Id.). Dr. Sabio noted slight epigastric pain when examining Plaintiff's abdomen. (Id.). The examination of Plaintiff's extremities revealed tenderness over the hips and ankles, no calf tenderness, no joint nodes, negative Tinel's sign, which is used to detect irritated nerves, on both wrists, a pelvic tilt to the right side and a shorter right leg than left, as measured from the right anterior superior iliac spine to the tip of the lateral malleolus. (Id.). The spinal examination showed tenderness over the spinous processes of the lumbar spine, tenderness of lumbar muscles on both sides and no kyphosis or scoliosis. (Id.). Plaintiff's range of motion showed some limitations, such as a limited straight leg raise and pain with a lumbar flexion forward at the 90 degree level. (R. 225-26). Plaintiff's motor strength was 5/5 in the bilateral upper and lower extremities and his deep tendon reflexes were normal. (R. 226). Plaintiff was able to walk on the heels, on the toes and heel-to-toe in tandem. (Id.). Plaintiff was able to stand on either leg separately, to squat fully and had normal fine manipulation movements. (Id.).

Dr. Sabio's diagnostic impression was 1) hypertension, 2) short right leg, 3) degenerative disc disease and 4) history of hepatitis C. (R. 226). In regard to Plaintiff's hepatitis C diagnosis, Dr. Sabio noted that Plaintiff showed no tenderness in the abdomen, no enlarged liver, no jaundice nor evidence of liver failure. (Id.). Dr. Sabio further noted that Plaintiff has a chronic back strain and did not have any swelling, redness or effusion in any of the joints of the upper and lower extremities. (R. 227).

### b.  Adult Mental Profile by Wilda Posey, M.A., November 2, 2010

On November 2, 2010, Wilda Posey, M.A. conducted a clinical interview and mental status examination on behalf of the West Virginia Disability Determination Service. (R. 228-232). The only records reviewed were Dr. Sabio's Social Security Determination report from September 29, 2010. (R. 229). Plaintiff reported receiving mental health counseling. (Id.). As for his symptoms, Plaintiff explained that "I worry about making ends meet. I am not really sad" and that he gets "agitated from hurting all the time." (Id.).

The mental status examination noted that Plaintiff demonstrated a limp of the left leg and utilized a cane but otherwise his posture was unremarkable. (R. 231). Plaintiff's hygiene and grooming were within normal limits. (Id.). Plaintiff was compliant and cooperative during the interview and interacted with the examiner within normal limits and made good eye contact. (Id.). Plaintiff's speech, orientation, mood/affect and thought process were normal. (Id.). Plaintiff's insight appeared to be fair and judgment considered to be within normal limits. (Id.). Plaintiff's immediate and recent memory were within normal limits and remote memory was fair. (Id.). Plaintiff's concentration was considered to be moderately impaired. (Id.).

As for his daily activities, Plaintiff reported he wakes up at 7:00 a.m. or 8:00 a.m., gets firewood, cleans his home, watches movies, cooks daily and performs laundry. (R. 232). Plaintiff also showers on his own and shops with a friend one time per week. (Id.). Plaintiff does not drive unless he has to go to the doctor and travels approximately two times a week. (Id.). Plaintiff's social functioning was deemed to be within normal limits. (Id.).

Ms. Posey did not diagnosis Plaintiff with any mental illness or impairment. (R. 231). Ms.

Posey explained that Plaintiff "denied dysphoric mood, being depressed or being anxious. The claimant reported worrying about making ends meet and becoming agitated from his pain." (Id.). In conclusion, Ms. Posey noted that "[t]he claimant does not meet diagnostic criteria for a diagnosis based on DSM-IV TR Manual." (Id.).

### c. Physical Residual Functional Capacity Assessment by Daniel J. Martin, November 18, 2010

On November 18, 2010, Daniel J. Martin, a single decision-maker, completed a physical RFC of Plaintiff. (R. 65-72). The report indicated Plaintiff was limited to occasionally lifting twenty (20) pounds, frequently lifting ten (10) pounds, stand and/or walk for a total of about six (6) hours in an eight-hour workday and unlimited pushing and/or pulling. (R. 66). As for postural limitations, Plaintiff was limited to occasionally climbing, stooping, kneeling, crouching and crawling and never balancing. (R. 67). Plaintiff had no manipulative, visual or communicative limitations. (R. 68-69). Plaintiff had unlimited environmental limitations with the exception of avoiding concentrated exposure to hazards, such as machinery, heights, etc. (R. 69). Mr. Martin discussed Plaintiff's adult function report and pain report. (R. 70). He concluded that Plaintiff's "statements of functioning are not very consistent with the medical evidence of record ("MER") in file." (R. 70). Mr. Martin explained:

> he states he uses a cane and a wheelchair d/t trouble walking and standing, yet the consultative examination ("CE") report stated he can walk/stand and squat fully. ROM wasn't very limiting and XR of L spine was nml. CE report did mention that he walked w/a cane. Overall, the allegation put forth by clmnt (on application and at CE) are not fully supported by the MER in file. Clmnt is considered only partially credible.

(R. 70). In preparing the report, Mr. Martin did not review any medical source statements. (R. 71). Mr. Martin noted he reviewed an x-ray of Plaintiff's left spine from September 29, 2010, which

was normal. (R. 72). Mr. Martin also reviewed the consultative examiner report from September 29, 2010. (Id.).

On February 10, 2011, Dr. Amy Wirts, M.D., who has a specialty in internal medicine, reviewed the medical evidence in the file and affirmed the physical RFC completed on November 18, 2010 as written. (R. 249).

### d. Psychiatric Review Technique by Dr. Joseph A. Shaver, Ph.D., November 18, 2010

On November 18, 2010, Dr. Shaver completed a Psychiatric Review Technique of Plaintiff. (R. 234-247). Dr. Shaver concluded that Plaintiff's current mental status examination does not indicate the presence of a medically determinable mental impairment. (R. 246). Dr. Shaver further noted that Plaintiff failed to allege any psychiatric problems and that his AFR suggests problems with memory and concentration. (Id.). Dr. Shaver further noted that Plaintiff is not taking medication nor seeking treatment. (Id.).

On January 26, 2011, Dr. G. David Allen, Ph.D., who has a specialty in psychology, affirmed the assessment completed on November 18, 2010 as written. (R. 248).

## D.    Testimonial Evidence

At the ALJ hearing held on March 19, 2012, Plaintiff testified that he was single. (R. 46). Plaintiff stated he graduated from high school and completed one year of college in medical lab technology at Alleghany Community College. (R. 46-47). He also completed vocational training for heavy equipment operation and welding. (R. 47). Plaintiff served in the Navy from 1973 to 1974 and received an honorable discharge due to his chronic dislocation of his left patella. (Id.). Plaintiff testified that he previously worked in the gas and oil field industry as a laborer. (Id.).

Plaintiff stopped working in 1991 when he became disabled. (R. 48). Plaintiff explained that he received workman's compensation for several years and received a permanent partial settlement from the injury. (R. 48-49). When asked to explain his injury leading to his disability, Plaintiff stated "I mashed my neck and the disc went into my spinal cord and cut the nerves in my spinal cord." (R. 49).

Plaintiff testified that he has lived with his sister, mother, friends and his fiancé. (R. 48). He receives welfare benefits, foot stamps and a medical card. (Id.). Plaintiff believed that he previously received social security disability because his checks "said SSD" on them. (Id.). Plaintiff's benefits were suspended when he was incarcerated in 2007 and he filed for SSI after he was released from jail. (R. 49).

Plaintiff further testified regarding his impairments and medications. Plaintiff testified that his ability to work is limited by severe headaches, degenerative disc disease, arthritis and spinal stenosis. (R. 49). Plaintiff testified that he had surgery on his neck in 1993. (R. 50-51). He also stated that his right leg is shorter than his left leg. (R. 50). Plaintiff testified that he is currently in a wheelchair and receives epidural blocks to his lower back, which allow him to move. (R. 49). Plaintiff explained that he has intermittently used a wheelchair since 2007 and also utilized a cane. (R. 50). Plaintiff stated "I've had all my meds taken away from me now and I'm just to the point where I can hardly move." (Id.). Plaintiff also has hepatitis C and underwent a liver biopsy in December 2011. (R. 53). At the time of the hearing, Plaintiff was waiting to be approved for interferon treatment for his hepatitis C. (R. 54).

Plaintiff also testified that he had blood pressure problems and two heart attacks. (R. 50).

Plaintiff further explained that prison health officials wanted to give him a heart catheterization and put stints in but he refused. (R. 53).

Plaintiff also testified regarding his abilities. Plaintiff stated that he is able to walk on level ground for about twenty to twenty-five feet. (R. 52). He testified he is able to stand for about five to ten minutes. (Id.). He stated that he cannot bend over and he can only use his arms and hand very little. (Id.). He also testified that he can only repetitively lift about five pounds at a time. (Id.). Plaintiff stated that he can sit for about an hour before he has to lay down. (Id.).

As for his mental conditions, Plaintiff testified that he is being treated for depression, anxiety and panic attacks. (R. 53). Prior to his incarceration, Plaintiff received mental health treatment from Appalachian Community Health in Buckhannon, West Virginia. (R. 55).

Regarding his daily activities, Plaintiff stated that he has problems sleeping and sleeps only two to three hours a night. (R. 55). Plaintiff stated that he had problems taking care of his personal hygiene. (Id.). He explained that prior to his incarceration his fiancé helped him but in jail he now uses a handicap shower. (Id.). Plaintiff testified that he spent most of his day sitting on the couch or recliner. (R. 56). He explained that his girlfriend cooked for him, completed household chores, shopping and laundry. (Id.). He does not perform any yard work. (R. 58). Plaintiff stated that his hobbies and interests used to include hunting and fishing, which he is no longer able to do. (R. 57). He testified that he does not belong to any clubs or organizations but he tries to attend church when he is able. (Id.).

## E.     Vocational Evidence

Also testifying at the hearing was James E. Ganoe a vocational expert. Mr. Ganoe testified

that Plaintiff did not work after 1991. (R. 59). Mr. Ganoe gave the following responses to the

ALJ's hypothetical:

> Q: The state agency for an individual with the same or similar conditions utilized a light exertional level of work. Light is lifting 20 pounds occasionally, 10 pounds frequently…the light work activity is described in the record in two places: one, Exhibit C5E and Exhibit C6F. His profile is between the ages of 53 and 55. He has a high school education, one year of college.
>
> Age 55, he would be deemed to be disabled just under the grid rules. But prior to age 55, an individual limited to light work would not be disabled. Utilizing the light hypothetical that I gave you, would there be any job or jobs that would exist in the national or regional economy for an individual limited to light work prior to age 55?
>
> A: …a mail clerk working in private business…a garment sorter…Those are samplings, Your Honor.

The ALJ then questioned Mr. Ganoe about Plaintiff's ability to work if he is completely

credible as to the severity of his conditions:

> Q: And if the testimony of Mr. Long is considered credible and good, the residuals of his conditions, including the ones that he suffered from prior to going into prison, which is limited, but not necessarily precluded, Hepatitis C, arthritis, headaches, residuals of neck surgery, residuals of chest pain and chest problems…problems using his hands and arms, carpal tunnel, and assume that I find that his concentration, persistence and pace reaches to a degree of marked. By marked I mean off task and unable to complete a full eight-hour workday, five days a week for 40 hours. He would be absent from work more than two times in a 30-day period. Based upon that consideration, would there be any jobs that you could identify?
>
> A: No, there would be any jobs available, Your Honor.
>
> Q: And is all the testimony that you've given me today consistent with the Dictionary of Occupational Titles?
>
> A: Yes, Your Honor.

(R. 58-60). Plaintiff did not question the vocational expert. (R. 61).

**F.  Report of Contact Forms**

A report of contact form dated November 18, 2010 states that Plaintiff is limited to light extertional work with postural restrictions and no mental restrictions. (R. 192). The examiner found that Plaintiff had no substantial gainful activity in the previous fifteen years but that he could perform work as an assembler, cleaner/housekeepers or a mail clerk. (<u>Id.</u>).

**G.  Lifestyle Evidence**

On an adult function report dated August 20, 2010, Plaintiff stated that he is in constant pain and that any exertion causes more pain. (R. 184). He explained that he cannot stand or walk very long, bend over or stoop. (<u>Id.</u>). As for his daily activities, Plaintiff states he eats, sits on the porch, watches television, lies down when headaches become bad, checks the mail and either sits in a chair or lies down depending on pain. (R. 185). Plaintiff stated that it is very hard to get dressed because he can hardly bend over, he experiences pain when getting in and out of the bath tub and getting on and off the toilet. (<u>Id.</u>). Plaintiff further explained that he does not care for others or pets, he prepares his own meals daily, which include sandwiches, cereal and frozen dinners, but he noted his cooking habits have changed since the onset of his conditions because he is unable to stand very long. (R. 186). As for household chores, Plaintiff stated he is able to wipe counters, do laundry and vacuum, which takes approximately an hour and a half to two hours a "couple times" a week. (<u>Id.</u>). Plaintiff stated he does not need help with housework. (<u>Id.</u>). Plaintiff stated he goes outside usually daily but is limited by his pain. (R. 187). Plaintiff explained that he is able to drive a car occasionally unless his headaches are bad. (<u>Id.</u>). He also shops in stores for food and clothes on a monthly basis for about two hours. (<u>Id.</u>). As for hobbies and interests, Plaintiff stated he reads

and watches television on a daily basis, which he is able to do as long as his headaches are not bad. (R. 188). In regard to social activities, Plaintiff explained that he spends time with others several times a week either over the phone or with people visiting him. (Id.). Plaintiff stated that he does not go out very much due to his conditions. (R. 189).

In regard to his abilities, Plaintiff alleged limitations in lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, stair climbing, memory, completing tasks, concentration, and using his hands. (R. 189). Plaintiff explained that movement of his joints and muscles causes pain and his headaches are so bad that they affect his concentration, memory and ability to do things. (Id.). Plaintiff stated he could walk for approximately 100 to 200 yards before needed to rest for about fifteen or twenty minutes. (Id.). Plaintiff said he could pay attention for about one to two hours and has difficulty following written instructions if he is in too much pain. (Id.). Plaintiff further explained that he gets along with authority figures most of the time, does not handle stress well and can handle changes in routine. (R. 190).

Plaintiff further stated that he has used a wheelchair and cane since 2009 and a brace/splint since 2010. (R. 190). Plaintiff explained that he always uses a cane, occasionally uses a wheelchair and wears the brace at night. (Id.). Plaintiff also noted that he is prescribed Elavil, which is used to treat depression. (R. 191).

On August 20, 2010, Plaintiff completed a Personal Pain Questionnaire. (R. 179-83). Plaintiff reported experiencing aching, throbbing and crushing headaches on a daily basis. (R. 179). Plaintiff takes prescription medication including hydrocodone, Motrin and Percodan for his pain. (R. 180). Plaintiff also reported experiencing an aching, stabbing, cramping and throbbing

pain in his lower back and legs approximately four to five times per week. (Id.). Plaintiff classified the pain as a five at best and a ten at worst. (R. 181). He explained that the pain is make worse by twisting, bending and standing and is relieved by lying down. (Id.). Plaintiff is prescribed codeine for his back pain. (Id.). Plaintiff further reported an aching and throbbing pain in his feet, which he experiences several times per day and lasts for about two hours depending on how long he has been standing. (R. 181-82). This feet pain is relieved by lying down, putting his feet up and taking the aforementioned pain medications. (R. 182).

Plaintiff completed a second adult function report on December 27, 2010, in which he again described his conditions as including severe headaches, lower back pain, pain from degenerative disc disease due to neck injury and carpal tunnel syndrome. (R. 202). Plaintiff's statements regarding his daily activities, personal care, meal preparation, housework, getting around, shopping, hobbies and interests and social activities were largely the same as the prior report. (R. 202-07). Plaintiff reported similar limitations on his abilities as stated in the prior report. (R. 207).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. *Id.*

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

> **1.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq*.).**

2.      Since the alleged onset date of disability, December 18, 1995, the claimant has had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, status post remote cervical discectomy; short right leg with pelvic tilt, status post remote history of right leg open reduction and internal fixation; hypertension; history of hepatitis C; and obesity (20 CFR 416.920(c)).

3.      Since the alleged onset date of disability, December 18, 1995, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that since December 18, 1995, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he must work in a controlled environment free of concentrated exposure to hazards such as dangerous and moving machinery and unprotected heights requiring no more than occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps/stairs, and no climbing of ladders/ropes/scaffold and C4F [sic].

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. On July 6, 2011, the claimant's age category changed to an individual of advanced age (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).

9.      Prior to July 6, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant number in the national economy that the claimant could have performed (20 CFR 416.969 and 416.969a).

10. **Beginning on July 6, 2011, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 416.960(c) and 416.966).**

11. **The claimant was not disabled prior to July 6, 2011, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 416.920(g)).**

(R. 23-30).

# VI. <u>DISCUSSION</u>

## A. Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th

Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

In Plaintiff's Motion for Summary Judgment, he alleges that:

- The ALJ erred because the evidence supports a finding that beginning on December 18, 1995, Plaintiff has had an impairment that meets the criteria for one of the listed impairments, specifically Listing 1.05C[3] based on Plaintiff's degenerative disc disease and chronic pain syndrome.

- The ALJ erred by failing to consider Plaintiff's first disability decision and medical records contained in Plaintiff's first SSI application dated December 18, 1995, which would provide evidence proving disability based on Plaintiff's degenerative disc disease and chronic pain syndrome. The ALJ failed to consider medical records from St. Mary's Correctional Center and Huttonsville Correctional Center, which were listed on his Disability Report provided to the SSA. (R. 177). The ALJ also failed to consider Plaintiff's MRI records from July 15, 2011 ordered by Josh Baker from Tri-County Health Clinic.

- The ALJ erred by failing to call a medical expert to testify that the administrative hearing.

- The ALJ failed to incorporate the proper functional limitations in the residual functional capacity assessment and corresponding hypothetical question posed to the vocational expert.

- The ALJ erred by giving "weight" to a non-medical opinion.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 2-4, ECF No. 24). Plaintiff argues that the medical evidence establishes that he has degenerative disc disease and chronic pain syndrome, the symptoms associated with these impairments have persisted since December 18, 1995 and Plaintiff should be found disabled. (<u>Id.</u> at 5).

---

[3] While Plaintiff cites to Listing 1.05C, it appears Plaintiff intends to refer to Listing 1.04, disorders of the spine, because Listing 1.05 deals with amputations. <u>See</u> 20 CFR Part 404, Subpart P, App. 1 §§ 1.04-1.05.

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- Substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria of any of the listed impairments.

- The relevant period in this case only extends back to the date of Plaintiff's current SSI application.

- It was not necessary for the ALJ to seek medical expert testimony in this case.

- The ALJ's residual functional capacity assessment and corresponding hypothetical question to the VE accounted for all of Plaintiff's credible functional limitations during the relevant period.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 7-14, ECF No. 26).

## C.    Analysis of the Administrative Law Judge's Decision

### 1.    Failure to Consider ALJ Taylor's Prior Finding of Disability

The Fourth Circuit's approach regarding a prior disability claim by an ALJ or the Appeals Council differs from SSA's interpretation of the regulation. In the Fourth Circuit:

> where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, *SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances* when adjudicating a subsequent disability claim involving an unadjudicated period.

Interpreting <u>Lively</u>, AR 00-1(4) (S.S.A. Jan. 12, 2000) (emphasis added). In <u>Lively</u>, the Fourth Circuit noted that *res judicata* applies to Social Security disability cases, which "prevents reappraisal of both the Secretary's findings and his decision in Social Security cases that have become final." <u>Lively v. Sec. of Health & Human Servs.</u>, 820 F.2d 1391, 1392 (4th Cir. 1987).

The Lively decision was further clarified by the Fourth Circuit in Albright, in which the court explained:

> Rather than signaling a sea change in the law of preclusion, the result in Lively is instead best understood as a practical illustration of the substantial evidence rule. In other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence. To have held otherwise would have thwarted the legitimate expectations of claimants—and, indeed, society at large— that final agency adjudications should carry considerable weight.

Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473, 477-78 (4th Cir. 1999). Thus, while an ALJ must consider prior RFC findings, he or she is not bound to adopt those RFC findings verbatim but must consider the prior findings and assign a weight to such findings. Id.. Moreover, the Court further explained in Lively that "[p]rinciples of finality and fundamental fairness drawn from § 405(h), as discussed above, indicate that the Secretary must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was capable of performing medium work." Lively, 820 F.2d at 1392.

Following the Lively and Albright decisions, the SSA issued Acquiescence Ruling 00-1(4), in which the SSA promulgated the procedure an adjudicator must follow when there is a final decision by the ALJ or Appeals Council in a prior disability claim:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period *must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances*. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period

previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in <u>Lively</u>. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in <u>Albright</u>. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

AR 00-1(4) (S.S.A. Jan. 12, 2000) (emphasis added).

In the present case, ALJ Mills failed to apply the above legal standard in considering Plaintiff's prior final disability decision. In light of ALJ's Taylor's binding decision that Plaintiff met a listed impairment and was disabled beginning December 18, 1995, and in light of the lack of substantial evidence to support a conclusion that Plaintiff's condition had improved to a degree that would allow him to perform light work since December 18, 1995 through July 6, 2011, ALJ Mill's RFC assessment and decision is not supported by substantial evidence. At the administrative hearing on his subsequent claim, the ALJ was made fully aware of Plaintiff's prior fully favorable decision. At the hearing, Plaintiff expressly requested that the medical records relating to his prior finding of disability be considered by the ALJ. (R. 43). In response, ALJ Mills explained that he would not consider Plaintiff's prior records but noted that "we consider your disability based on the fact that you had a prior award and I know what those impairments are." (R. 44). However, in

the ALJ's decision, ALJ Mills does not reference, explicitly consider or assign a weight to the 1999 ALJ decision by ALJ Taylor, which found that Plaintiff met a listing impairment and was disabled due to his degenerative disc disease and chronic pain syndrome. (R. 21-30). Due to this omission, the undersigned is unable to determine if the ALJ in fact considered Plaintiff's prior disability decision, and what weight, if any, the ALJ gave to the findings of Plaintiff's prior disability decision. The ALJ failed to comply with the Fourth Circuit precedent as established under <u>Lively</u> and <u>Albright</u> and AR 00-1(4), which clearly sets out the proper procedure an adjudicator should apply when considering a subsequent disability claim within the Circuit. Accordingly, the undersigned finds that the ALJ failed to apply the proper law when determining Plaintiff's eligibility for benefits.

Moreover, substantial evidence does not support a finding that Plaintiff's medical condition so greatly improved that he was capable of light work. The Fourth Circuit held that "the Secretary must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant" was capable of performing at a higher extertional level than found in the previous ALJ decision. <u>Lively</u>, 820 F.2d at 1392; <u>see also</u> <u>Aldridge v. Astrue</u>, 880 F. Supp. 2d 695, 700 (E.D.N.C. 2012). In 1999, ALJ Mills found that Plaintiff was capable of light work from his alleged onset date, December 18 1995 up to Plaintiff's fifty-fifth birthday, July 6, 2011. During this time period, however, the medical evidence shows that Plaintiff continued to be diagnosed with degenerative disc disease and chronic pain syndrome, the underlying conditions supporting his initial favorable disability decision. (R. 255, 359, 385, 386, 423-26, 427-38, 430-32, 433). The record reflects that Plaintiff continued to report pain, difficulty walking and utilizing a cane or

wheelchair. Even while incarcerated, Plaintiff continued to receive pain medication. (R. 311). These facts are inconsistent with a finding that Plaintiff's condition somehow abated from the period between August 2006, the time Plaintiff's benefits were terminated, and July 6, 2011, the date Plaintiff's age category changed and he was found to be disabled. The Court finds that the medical evidence of record demonstrates that Plaintiff, at best, was in the same condition during that time frame he was previously awarded benefits based on a listed impairment.

In addition, because Plaintiff was limited to light work during this time frame, Plaintiff was found to be disabled when his age category changed on his fifty-fifth birthday, July 6, 2011. (R. 30). Social Security regulations provide for a flexible approach to the grids considering the age cut-off. See 20 C.F.R. § 404.1563(a) ("If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case"); see also Aldridge, 880 F. Supp. 2d at 700. Here, Plaintiff is seeking SSI benefits as of September 1, 2010, a mere ten (10) months before his fifty-fifth birthday. In keeping with the principle as outlined in 20 C.F.R. § 404.1563(a), the undersigned finds that the Commissioner should have also considered whether to use the older age category when considering Plaintiff's eligibility for benefits, which falls just ten (10) months before he was found to be disabled at the age of fifty-five.

**2. Other Legal Issues**

Due to the ALJ's legal error as outlined above, the undersigned will not address the other alleged errors Plaintiff raised in his Motion for Summary Judgment.

## VII.    RECOMMENDATION

The decision whether to reverse and remand for benefits or reverse and remand for a new hearing is one "within the sound discretion of the district court." <u>Edwards v. Bowen</u>, 672 F. Supp. 230 (E.D.N.C. 1987); <u>see also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984). The Fourth Circuit held that it is appropriate for a federal court to "reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." <u>Breeden v. Weinberger</u>, 493 F.2d 1002 (4th Cir.1974); <u>see also</u> <u>Rodriquez v. Comm'r of Soc. Sec.</u>, No. CIV.A. 1:12CV99, 2013 WL 4478103, at *11 (N.D.W. Va. Aug. 19, 2013).

For the reasons stated herein, the undersigned respectfully recommends reversal for an award of benefits in the case. I find that the Commissioner failed to properly apply the law when determining Plaintiff's eligibility for benefits by not applying the proper procedure as outlined in AR 00-1(4) regarding consideration of findings from a prior final disability decision. The ALJ's failure to consider ALJ Taylor's decision is of particular concern because the ALJ found that Plaintiff met one of the listed impairments. Further, substantial evidence does not support a finding that Plaintiff's medical condition so greatly improved that he was capable of light work. Moreover, Plaintiff was found to be disabled on his fifty-fifth birthday, July 6, 2011, when his age category changed and the ALJ applied Medical Vocational Rule 202.04, which directed a finding of disabled. (R. 30). Plaintiff seeks benefits beginning just ten (10) months prior to his fifty-fifth birthday, a relatively short amount of time before Plaintiff reached this older age category. Additionally, due to Plaintiff's incarcerations during 2011, he is ultimately only seeking benefits

for a period of approximately seven (7) months. Based on all of these factors, the undersigned finds that reopening the record for more evidence would serve no purpose and other further cause undue delay and administrative burden. Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 24) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 25) be **DENIED**, and the decision of the Commissioner be **REVERSED and REMANDED** for an award of benefits.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record and to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket sheet.

Respectfully submitted this 6th day of November, 2014.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE